I had it right the first time. Number 13-4769, Ms. Stern and Ms. McKeon. Well, my clerks told me that's how you said it. I said you were wrong. I'm wrong again. Good afternoon, Your Honor. Cheryl Stern for Appellant Michael Nguyen. May I reserve five minutes for rebuttal? I'm sure you can. Thank you. Going all the way back to 1940, the United States Supreme Court said in Avery v. Alabama, if no actual assistance for the accused defense is provided, then the constitutional guarantee of the Sixth Amendment has been violated. To hold otherwise would convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. Your client, Mr. Nguyen, had four counsel, one just dealing with grand jury, so that's out. So you have Mr. Griffin and Mr. Laver. Where's the prejudice? Because apparently with Mr. Laver there was discussion about whether there could be some type of agreement, maybe a cooperation agreement, maybe just a straight plea agreement. But everyone conceded, including the AUSA, that Mr. Nguyen had a pretty decent case. They didn't have him on any tape or any recording, and none of the preliminary discussions went anywhere. So how can we find, based on this record, that there's any prejudice whatsoever? Well, Your Honor, I don't see any evidence that there were any preliminary discussions held with Mr. Nguyen. Mr. Nguyen submitted a... No, what we have is Mr. Laver's debt. Yes. And so, but Mr. Nguyen did say that he had spoken with Laver pre-trial and that there was some discussion and that Laver thought that he had a tribal case, a decent chance to win, and he was going to go for it. And also, by that time, by the time you got toward trial, a cooperation agreement probably didn't make any sense because everyone else of the 27 persons indicted had pled, and the only real cooperation he could have given would be to people outside the 27 persons. And the trouble is that Mr. Nguyen was in prison, so he wasn't able to help much there either. Well, that is the prejudice, Your Honor, that by the time Mr. Nguyen went to trial, his chance for a meaningful and perhaps a much more favorable plea agreement had evaporated by that point. I think you're concentrating on Mr. Griffin, right? Yes. Mr. Griffin, and you're claiming one chronic error for complete abandonment during plea bargaining. Correct. And the judge believed Mr. Griffin that he had no offer from the U.S. attorney. He didn't get a message from Mr. Nguyen that he wanted to pursue this. The district judge believed that. He, I think, apparently met with him twice maybe in this whole year and a half period. But even before Mr. Griffin got involved, three people were already cooperators, right? Yes. Okay, so where is the complete abandonment, if you're claiming chronic error, of representation during the plea bargaining phase? Because within less than a month after the time Mr. Nguyen was arraigned, the government filed a motion asking to have the case declared complex and put into the motion that ongoing discussions were being held with every defendant in the case towards a possible disposition of a non-trial disposition in the case. Okay, at that point, it has to be, if Mr. Fritchie's testimony is believed, he has conveyed to Mr. Griffin an opportunity for Mr. Nguyen to enter into a plea. And Mr. Fritchie identified the type of plea Mr. Nguyen could enter into. He could enter into a non-cooperation plea. He could, as Mr. Fritchie put it precisely, he could take a stab at cooperation. He could enter into a cooperation plea and take a stab at cooperation. Now the objective evidence is that that was never conveyed to Mr. Nguyen. While Mr. Nguyen is sitting in jail for 14 months waiting for any word from his attorney, and this is the precise language he put in his pro se motion filed on September 8, 2006, almost a year after, he said September 29, 2005, was the first and last occasion that the defendant has met, spoke with, or communicated in any form with Mr. Griffin. Now what the judge's opinion leaves out is that he held a hearing on this motion. And before the hearing, there was an in-chambers conference where I'm certain that the judge said to Mr. Griffin, how about this claim, no communication of any kind. And at the conclusion of the in-chambers conference, everyone went on the record. Mr. Nguyen repeated his claims that he had no communication whatsoever with his attorney in any form. And Mr. Griffin's sole response was not that any of this is untrue. Your Honor, I met with him multiple times. Here's the letters I can show I met with him. Mr. Griffin's response was, I just got the discovery. So that must be what he said in chambers. What did he say? I just got the discovery. He just got the discovery, so he wasn't able to go forward until he got it. But during this year period, all but a handful, as Mr. Fritsch, you described, at the hearing held on the motion to dismiss, all but a handful of people had pled guilty, had worked out agreements where there were counts dropped, where there were stipulations to the sentencing guidelines that were applied. Getting back to Mr. Griffin, Mr. Griffin apparently from the, I mean, your client never indicated to Mr. Griffin at any time that he did meet him on those two occasions that he was interested in pleading guilty, that he was interested in any type of deal. And the AUSA indicated that no deal was ever offered to the band. Because they had a pretty strong case. They didn't want to offer him anything. And even when the new attorney was appointed, your client never indicated to the new attorney or on the record when Griffin was replaced that he was interested in a plea agreement. There's nothing in the record that indicates your client was ever susceptible to a deal here. Well, the first meeting that Mr. Griffin had with Mr. Wynn was the day Mr. Wynn was arraigned. Okay, I've been doing this for quite a while. And the first time you meet your client after you're appointed, you do not walk in and say, how do you do, I'm your guilty plea attorney. You walk in and you say, I'm your trial attorney, your defense attorney.  What plea did Mr. Wynn say he would have entered into if it were offered? He said that he would have pled guilty and offered to cooperate had this been presented to him as an opportunity. What evidence do you have that he would have chosen to plead guilty had a non-trial disposition been more vigorously pursued? Well, Mr. Fritchie testified at the hearing twice, because the judge asked him to repeat this, that when he spoke to Mr. Laver, Mr. Laver told him that Mr. Wynn did not want to go to trial. He did not want to go to trial. That was Mr. Fritchie's testimony at the evidentiary hearing. There's the extreme difference, and this is recognized in Frey and in Laver, the difference between the sentence imposed and the sentence that could be possible under the plea. Even if you only got three points off for acceptance of responsibility, the guidelines were to be done at 188 months, not the 262 months that the client received. When there was a transfer of attorneys, your client never indicated at that time that he was interested, that this man abandoned him. At that time, he had met him originally, as you mentioned. He had gotten some discovery, which he went over with your client. And he didn't indicate that at any time. Your client never indicated, certainly the attorney never indicated that your client was interested in a plea deal. Mr. Griffin testified he never conveyed to Mr. Wynn any indication that there was plea negotiations to be had. Mr. Fritchie testified, he told Griffin, that the government was interested in negotiating a plea with Mr. Wynn. Do you have a cite for that where Mr. Fritchie testified in his discussions with Laver, that Laver said that Wynn didn't want to go to trial? Mr. Fritchie testified specifically. Do you have a cite for that? Pardon me? Do you have a cite? I'm looking for a cite for that. Mr. Fritchie testified that Mr. Wynn either did not want to plead guilty or hadn't made up his mind. That was Mr. Fritchie's testimony. I can get the exact quote for you. We'll get back on rebuttal if you would give us that exact quote. The AUSA indicated that the government never made a deal, didn't it? Never made an offer. Never made an offer. Offer is not the same as negotiation. Laffer and Cooper and Frye and Missouri are about plea negotiations, not plea offers. It's not limited to plea offers. It's ineffective assistance of counsel at the plea negotiation stage. Mr. Fritchie's testimony was very clear. The government had contacted Griffin, as he did every other attorney in the case, and said they were interested in negotiating with Mr. Wynn. Is your claim here under Strickland or are you saying abandonment under Cronic? I'm saying abandonment under Cronic. I'm saying we can meet the standard under Strickland, but we shouldn't have to prove prejudice because it was complete abandonment. How is there any abandonment here when there was never any offer made by the government? Because there was an offer to negotiate. The offer to negotiate, that's the plea negotiation stage. That's what your client said, correct? No, it's what Mr. Fritchie said. Throughout his testimony, he said it. They were interested in negotiating with Mr. Wynn, as they were with every defendant, and every defendant except Mr. Wynn entered into a plea agreement. When we get you back then on rebuttal, we'll encourage that quote you're talking about from AUSA Fritchie. Ms. McKeown? May it please the Court, Bernadette McKeown on behalf of the government. I can answer that question for Your Honor because she is correct that at one point Did I mispronounce the name again? Ms. McKeown? Yes. Sorry, my fault. Counsel is correct that at one point during the evidentiary hearing, Mr. Fritchie was asked a question, and I can get you the exact site. He was asked several questions about counsel's discussions with their client. He did at one point say, with respect to Mr. Laver, it was clear that he stated that he did not want to go to trial. When read in the context of Mr. Fritchie's entire testimony, it's very clear that he misspoke. He repeatedly testified that he had just raised with both counsel the possibility of Is there a chance that they could get together and discuss, I guess? Correct. He said no one ever got back to him and said he's interested in proffering, neither attorney. The problem is that you've got Griffin, who met at most twice with Mr. Wynn from when he was appointed to 14 months later or thereabouts, when he met with him a couple days before this November 29th hearing. And the question really is, was there abandonment during that period of time? Your Honor, our position is absolutely not. That's not attorney abandonment under the chronic standard. Chronic is a very narrow exception to the Strickland prejudice standard, and it applies only where there is constructive denial of counsel. A complete abandonment. Well, is there a denial here? He didn't see the man for, saw him once when he was appointed, saw him once to discuss something, a discovery. For 10 minutes. And for over a year never said a word. Well, first of all, Mr. Griffin was very clear that he was not sure how many meetings he had with the defendant, how many discussions or the pattern of communication. He said twice, I think. Well, we know he met on those two occasions. We do not know that there weren't other conversations because he expressly said, I don't recall. And as a matter of fact, when you go through his testimony, he did recall a conversation where the client said, I want you to come and visit me frequently. And he said, I can't do that. It was so few that he didn't even submit a CJA document. I would not argue with that, Your Honor. I've never seen that happen.  And there's something that indicated he visited the jail. But the BOP records that were submitted were completely inconclusive. And Judge Donovan made that comment. Well, I'm looking at the evidence in light of the petitioner here. Even assuming that his contact was limited to his discussion at the beginning, in the early stages of the case. And every time he addressed it, he said, I had discussions early on, plural, number one. Secondly, and then there's a gap, and he sees him again towards the end of the period. That is not abandonment. Whether or not that's ineffectiveness is another issue, and that's where Strickland comes in. This is a Strickland case. I can't emphasize that enough. This does not fit into the chronic, limited, abandonment. Well, why can't we assume the fact that he didn't, that Griffin didn't make any overtures to the guard and say, look, if you give us a deal, I'll let me run it by my client. Maybe we can get together without a trial. What Griffin testified to very clearly was it was his routine in every federal case. He was a very experienced federal criminal defense attorney. That he knew that cooperation was always on the table, that he raises it with every federal client. The general options, whether he wanted to cooperate and plead, whether he wanted to plead guilty or go to trial. He couldn't remember the exact conversations. What he said was, I do this invariably. And he also said, it was so clear to me that he had no interest in a non-trial disposition. And then what happens? This is a huge case. This is a 27 defending case with multiple wiretap, four months of wiretap against other defendants, mind you, where a complex case motion is filed within three weeks of the filing of the superseding indictment, naming Mr. Wynn. At that point, counsel, what does he do? He has a client who's saying, I want to go to trial. And he also knows that the case is thin. At this point, he knew that his client was not on wiretap. So what does he do? He waits until he receives discovery. He goes and sees his client. At that point, he says, this is a very thin case. There's no indication at any time that he wanted to cooperate. You know, after half the people plead guilty, it's one case. But if someone makes an overture to the government when there's no one pleading guilty or one or two, the government is very receptive to shoring up its case. And the fact that he didn't, for 14 months, didn't have any rapport with the guy, is that a chronic indication that? No, that's not chronic. And it doesn't even satisfy the prejudice standard under Strickland because of the circumstances of this case. By the time that Mr. Wynn was indicted in September of 2005, every co-defendant against whom he could have cooperated had signed a cooperation plea agreement. Everyone. His role in this case was a wholesale customer. He only dealt with three individuals in the conspiracy. He could not cooperate against them because they gave him up first. That's why he was brought in front of the grand jury at a time prior to that. So his only option from the day he was indicted until the time he went to trial was to testify against somebody else, to cooperate against somebody outside this case. To this day, he has not identified anyone he would have been capable of cooperating against. The government, when repeated references to Mr. Fritchie's conversation, Mr. Fritchie said, he always has that conversation with defense counsel. Let me know. These are your options. Let me know. Mr. Griffin said that was his routine anyway. And there was nothing to relay back to the government. There was no plea offer made because there was no interest on Mr. Wynn's part. Let me just ask one other question that is a bit off track. At the habeas hearing, at the 2255 hearing, Mr. Fritchie was representing the government? Yes, he was, Your Honor. But he also was a witness, was he not? Yes, and at that point they brought in AUSA Troyer to handle that part of the proceeding. And that's why I handled the appeal as well, Your Honor. Not that Mr. Fritchie couldn't handle it. We do that routinely in our office. But in any event, Mr. Fritchie became a witness because it involved the process in the case, and especially the procedural history, which was very critical, which showed, again, I come back to the point, this isn't chronic. This is Strickland. And under Strickland, the defendant has failed to meet his burden to prove prejudice. There's nothing in this record to show, first of all, if I go back to ineffectiveness, that counsel was even ineffective. Yes, he didn't have much communication with his client. But, again, the context of this case, there was nothing to do in that 14-month period. You have a defendant who wants to go to trial. You don't get discovery until closer, the later on period. Then you go meet your client and you can maybe talk about strategy. Just to pick up on one question, Judge Connell, if Mr. Fritchie had expressed a preliminary interest in possibly exploring cooperation with Mr. Wynn and possibly offering him a deal, wasn't Griffin obligated to at least discuss that with Wynn, convey that the government has an interest in perhaps pursuing this further? He had already raised that issue with him, and Mr. Fritchie didn't make that specific an overture. He said to every defense counsel, he said, let me know if your client is interested in non-trial disposition, cooperation, open plea, non-cooperation. There's no record of any specific conversation. As a matter of fact, Mr. Fritchie and Mr. Griffin repeatedly said he had no specific conversation. Let's assume that's all he said. But shouldn't Griffin have communicated that? Mr. Griffin believed that he did communicate that to his client. Everyone's focusing on the initial conversation with him, but he always uses the term discussions, early discussions in this case, which indicates that a judge found that there was more than one discussion, but it really doesn't matter. What matters is that that discussion was sufficient to put this defendant on notice of his plea option, his trial option, and also the other issue was his sentencing exposure, which Mr. Griffin was very concerned about. He mentioned that he was aware of that right from the bail report at the get-go, that it jumped out at him. This was a defendant with a serious criminal record who had faced a significant amount of time, and the judge found that that was adequately communicated because he said it would definitely have been. His practice was always to communicate that kind of information to his client. So what we have is Mr. Griffin being painfully honest about what he could and could not recall, and this is why the judge chose to credit his testimony that he did advise his client of the basic plea options, he did advise his client of the sentencing exposure, and later on advised his client about the strength of the government's case. And then from there, of course, once we're under Strickland, the court gets to consider whether or not, even if counsel's performance was in any way deficient, did at that point the appointment of Mr. Laver cure any deficiency, and our argument would be, yes, it did. He had the exact same opportunity to cooperate and plead guilty when Mr. Laver was representing, and as he did before, he still couldn't cooperate against a co-defendant, but he was still able to cooperate against someone else. And that was actually conveyed to him, and he admits that they had that discussion, Mr. Laver. So under Strickland, any deficiency in Mr. Griffin's representation would have been cured by the appointment of Mr. Laver. And that brings me back to Kronick again. Well, he was appointed, what, how much prior to the trial? Almost instantly the trial went forward. No, the trial, he was appointed in November of 2005. The trial didn't occur until July of 2006, eventually. I believe it was July of 2006, or the July date might have even been continued. At defense request. So your view is he never had a chance to cooperate against somebody else, so his only chance here was to plead guilty and get his acceptance of responsibility points. No, he could have. I mean, certainly the government. Somebody came in. No, I said against a co-defendant. A co-defendant. He had no chance to testify against a co-defendant, and there's no evidence he had any opportunity to testify against an outsider. Well, he is. An external. You call him an external. External, right. We have no indication of that. Okay. Yes. So it's not in this hearing that I just read that he had, that there was any external that he could have testified about. Not from the government's knowledge. Okay. It would have been up to the defendant to approach us, and that's how it happens many times. The defendant will come forward and say, I have somebody I can cooperate with. In your view, this is all about whether Griffin told him early on that he had a chance to plead guilty and get some acceptance of responsibility points. Or to cooperate. I thought you told me there's no chance. No, no. There was no chance of cooperating against a co-defendant in this case. Most of the defendants who pled guilty in this case cooperated, to use the term that was used in the brief at the hearing, externally. Other than those initial defendants. Richard testified that almost everyone, every defendant who signed a plea agreement after that. I understand. There's just nothing in this record about any externals. About his ability, no. And he still hasn't identified anybody. Thank you. I have no further questions. Any further questions? Thank you. Mr. Stern, I'm just wondering. It appears that your client was a frequent flyer in the sense that he was not a stranger to criminal litigation. He was to federal, Your Honor. Pardon? He was to federal litigation. Yes. Well, whatever. He attended the criminal courts. I knew he was not a babe in the woods here. Is there anything that when he was appointed by the, the new attorney was appointed, or when Griffith was let go, that he indicated to anyone that he was looking to make a deal? Or he's susceptible to overture? Is there anything that indicates that he was? Your Honor, with all due respect, I think we have the shoe on the wrong foot here. Okay? It's the attorney's job to do something. Otherwise, under the scenario that's been presented, we're wasting our time paying for appointment of counsel before the defendant makes up his mind whether he wants to plead guilty. Well, the way Griffith sort of took that off the table, because his position was when he was deposed in this proceeding, is that your client was not interested in going to try a plea deal of any type. I don't blame him. The evidence here was very, very, I'm amazed they got a conviction. The only people testifying against him had terrible records. He had a, I mean, this is a good case to try as a criminal defendant. And he got an acquittal on one of the charges. Yeah, I mean, so I, is there anything that your client said, he's an experienced man in these areas, when the new attorney was appointed, or the old attorney, or Griffith was let go, that look, he's seeking to make a deal here, no one is talking to him. Well, Mr. Griffith's testimony at the hearing was that he did not recall whether the government asked him to talk to appellant to determine whether appellant was interested in pleading guilty. His testimony was he didn't recall ever having a communication with Mr. Fritchie to go and talk to his client about whether he was interested in pleading guilty. Now, first of all, Mr. Griffith was removed for cause in this case. What was Fritchie's testimony that you were looking at? Yes, on A220, it's page 34 of the hearing, there were three hearings. What's the case? The hearing that was held on May 10th, 2012. Oh, you're kind of excited, I'm sorry. A220. A220. Okay, Mr. Fritchie's testifying, sorry, in Mr. Laver's case, he plainly didn't want to go to trial. The court, Mr. Laver said to you his client didn't want to go to trial, witness yes. The court, and Mr. Griffin, Mr. Griffin, I'm less certain. What I mean, my overall impression is that he either wanted to go to trial or hadn't totally made up his mind. But the bottom line is he never told me that the guy wanted to proffer or wanted to resolve his case short of trial. Now, let's get back to all these supposed meetings with Mr. Griffin. Okay, he met with Mr. Winn-Strange. Mr. Laver said my client doesn't want to go to trial. Mr. Laver is the trial attorney. No, no. That's what you just read, Laver. Right, but Mr. Fritchie's testifying. He's saying Mr. Laver said my client doesn't want to go to trial. Right. And then what happens? Mr. Fritchie says, well, is he going to plead guilty? I mean, nothing happens with Laver. What Mr. Winn testified to is Mr. Laver communicated that to Mr. Winn. And Mr. Winn said, I want to think about it. And then Mr. Laver never brought it up again. But at this point, the real opportunity cooperate had evaporated. The problem isn't really with Mr. Laver. It's with Mr. Griffin. Right. Exactly. Okay. Okay, but I was asked to read the quote, I thought. No, I thought the Fritchie quote, I didn't know what it was going to relate to. Okay. But you said at one point, Fritchie said that Winn wanted to plead. And you're telling me that his testimony with respect to the plea relates to a conversation with Laver. And I think Judge Rastani's point is that this whole case is really focusing on Mr. Griffin, as it probably should. Well, first of all, the prosecution just got up here and made the argument again that Mr. Fritchie misspoke when he said that about Mr. Laver. Okay, he misspoke. Okay. The judge asked the question, did you really mean to say that? And Mr. Fritchie repeated it. We filed post-hearing motions in this where the government had the transcript. The government never made any argument that Mr. Fritchie misspoke on that. But what everyone is overlooking here is that a hearing was held on Mr. Winn's very specific claims that between September 29, 2005, and November, shortly before the hearing on the motion to dismiss in November, there was no communication, no letter, no visit, no phone call, nothing with this attorney. No communication. How could Mr. Griffin be obtaining all of these refusals from Mr. Winn? Now, at the hearing, Mr. Griffin doesn't deny any of that. But before trial, we have Winn testifying. Question. Did Mr. Laver give you his professional opinion on the strength of the government's case against you at the time he told you about the plea offer? So he must have told him about something. Answer. Yes, he did. He said they have a very, his specific words, they have a very weak case against you. Question. Did he ask why you thought that, why he thought that? Answer. He just said this. Is the only thing they have on you is the piece of paper which indicated that the proffer made by Mr. Benjamin and Mr. Foucault at the moment? Question. Did Mr. Laver give you his professional opinion as to whether it was in your best interest to accept the plea offer and cooperate or go to trial at the time you were considering whether to plead guilty? Answer. Well, his words was that if I choose not to cooperate and to proceed to trial, that I have a good chance of coming out on top. Question. Did he ever give you his opinion as to what course of action you should take, plea or trial? Did he give you his opinion of what you should do? Answer. Well, he was heading towards trial. Right, but that's long after the better plea offer is available. If the plea offer was ever made at that time. After better plea negotiations could have been had. Mr. Wynn's sitting in jail for years. The whole year that he's waiting for Mr. Laver to come and see him, another almost year after, when he's waiting for Mr. Griffin to come and see him, another almost year while he's waiting for Laver to come. Okay, he had the opportunity. But your brief said that even acceptance of responsibility would have been three points less, and therefore there would have been, what, 188 to 235 sentencing guideline range instead of what he got, 262. Right, and the judge should not disagree that no attorney had told him he faced career offender guidelines. Okay, day in the circuit requires that a defendant at the plea stage be told that he faced career offender guidelines. He also said that at the same time Mr. Laver told him he wouldn't get more than 15 years if he went to trial and lost. So, but again, Mr. Griffin, for the chronic issue, was dismissed for cause. Okay, he did not defend himself at the hearing. He just said, I just got the discovery. Well, what about all the plea offers Mr. Fritchie was conveying? He never gave an explanation for not taking any plea offers. He pretty much acknowledged what Mr. Wynn said was true, that he had never gone to see him. And in this circuit, attorney is removed for cause, okay, and the case is Was the attorney removed for cause? Well, he had no conflict. He was removed. He was removed on Mr. Wynn's complaint. I can't recall that he was removed for cause. He did say that there was no finding of good cause to remove him. He didn't want to fight it, and the judge never made any determination as to his oath. That was my understanding. In this circuit, the standing for granting the dismissal of counsel is good cause, United States v. Goldberg. Okay, why are you citing that? We just said the record shows that he consented to be removed for cause. There was no determination by the judge. Well, there was no contest by the attorney. This is a very serious charge, to have not met with your client for 14 months. I don't know what you're fighting about. It seems to me that on this point, we're all in agreement. He decided not to fight it. There was no determination made by the court because he consented to be removed, whatever that means. Right, but there are many hearings that are held where at the end of the hearing,  In this instance, he did. What is your response to the government's position that, number one, this was not a good case the government had to begin with, and so it's understandable that a criminal defendant can say, look, I got a shot here. But beyond that, that even if he wanted to cooperate, there wasn't an awful lot he could do here in terms of the way the case broke. Sure, and there were lots of, I introduced a number of Exhibit Ds, where the government negotiated with these other defendants during the time that Mr. Griffin was doing no negotiating, even if they didn't cooperate. They got stipulations as to the quantities of drugs, stipulations as to the guidelines. They got counts dropped out. There were plenty of good things that happened for those defendants that were no longer available. And certainly, as you said, Mr. Wynn was a busy man. I think the bottom line is this. Of the 27 persons indicted, probably the weakest, if not among the weakest cases the government had, was against Mr. Wynn. And for whatever reason, he decided to go to trial. And just speaking only for myself, I don't see this as a chronic issue, so therefore we're under Strickland, and that's why I started with prejudice. What I can't find is the prejudice. I'll give you 30 seconds to answer that, and then we'll have to go. Mr. Wynn was not given all the information he needed to make an informed decision whether to go to trial and plead guilty. He was not advised of the career guidelines that would apply to him. He was misadvised as to the maximum sentence he faced if he went to trial. So he certainly could have achieved a better result by pleading guilty instead of going to trial, and nothing was cured by Mr. Laver. Okay, he still did not receive effective assistance of counsel, and there was a reasonable probability of a different outcome had he received that. Thank you very much. Thank you. Thank you to both counsel. Really well-presented arguments. We'll take the matter under advisement.